**Julia Locke STRINGFELLOW, Plaintiff–Appellant,**

v.

**FIRST AMERICAN NATIONAL BANK, Defendant/Third Party, Plaintiff/Appellee,**

v.

**W.T. STRINGFELLOW AND COMPANY, INC., Third Party Defendant/Appellee.**

Supreme Court of Tennessee, at Nashville.

May 9, 1994.

Phillip A. George, Nashville, for appellant.

Frank H. Reeves, Nashville, for appellee First American Nat. Bank.

Paula K. VanSlyke, Corbett, Crockett & VanSlyke, Nashville, for appellee W.T. Stringfellow and Co., Inc.

## OPINION

ANDERSON, Justice.

We granted permission to appeal to consider the important question of whether a bank may dishonor its own cashier's check. We conclude that a bank may not refuse to honor its cashier's check and that the payee is entitled to recover from the bank for its dishonor. In this case, the bank is subrogated by statute to the rights of the drawer against the payee. Because the evidence establishes that the payee owed the drawer more on the underlying transaction than the bank owes the payee for the cashier's check, the payee is not entitled to recover.

## BACKGROUND

Upon her husband's death in July of 1980, the plaintiff, Julia L. Stringfellow, became the owner of a one-half interest in W.T. Stringfellow and Co., Inc. ("the Company"), and assumed the office of secretary and treasurer. Her brother-in-law, T. Carter Stringfellow, owned the other one-half interest in the Company and held the office of president. In April of 1981, the plaintiff's son, W. Fields Stringfellow, was hired to oversee the day-to-day operations of the business, and in 1982 moved the Company's offices to property leased from the plaintiff. A building was erected and other improvements were made to the plaintiff's property for which the plaintiff reimbursed the Company the sum of $26,694.06. Shortly thereafter, the plaintiff and her brother-in-law signed a sales agreement in which T. Carter Stringfellow agreed to purchase the plaintiff's interest in the Company for $81,000 and to repay to the plaintiff a $20,000 loan she had made to the Company. In return, the plaintiff agreed to relinquish all her interest in the Company and to resign as a corporate officer by August 30, 1982.

Payment of the $81,000 was to occur immediately, but both parties agreed that the plaintiff would not receive payment of the $20,000 loan for at least sixty days so that the Company could conduct an audit to determine whether the plaintiff owed the Company any more money for the improvements to her property. In accordance with the agreement, the plaintiff received $81,000 from her brother-in-law on August 30, 1982. Another check to the plaintiff in the amount of $20,774.99 was written on the Company's account with the defendant, First American Bank, and delivered to the closing attorney, with instructions that the check should not be delivered to the plaintiff for sixty days.

After reviewing its records, the Company determined that the plaintiff still owed $24,-576.44 for the improvements to her proper-

ty.[1] Accordingly, on October 18, 1982, the company placed a stop payment order with the bank on the check in the possession of the closing attorney. The Company, however, did not give notice of the stop payment order to the plaintiff or the closing attorney, nor did they attempt to retrieve the check from the closing attorney. As a result, on October 19, 1982, in accordance with the agreement, the closing attorney released the $20,774.99 check to the plaintiff.

That same day, the plaintiff presented the Company check for payment at First American Bank and requested that the bank issue her a cashier's check in its stead. A bank officer consulted with the bookkeeping department to ascertain whether the company check could be paid. Overlooking the stop payment order of the previous day, the bookkeeping department mistakenly informed the officer that funds in the account were sufficient to cover the check. Based on that erroneous information, the plaintiff was issued a cashier's check drawn on First American Bank in exchange for the Company check payable to the plaintiff and drawn on the Company's account at First American Bank.

The cashier's check was deposited in the plaintiff's account at Third National Bank. First American discovered its mistake and requested the plaintiff to return the cashier's check. She refused. When the check was presented to First American Bank by Third National Bank for payment, First American dishonored the cashier's check.

The plaintiff sued First American seeking payment of the cashier's check. In response, First American filed a third-party complaint against W.T. Stringfellow & Co. and asserted its statutory subrogation right to the Company's claim against the plaintiff should she prevail. The case was decided in June of 1992, when the trial court found that First American was not liable to the plaintiff on the cashier's check. During the trial, the plaintiff did not dispute the fact that according to the Company's audit, she was still

indebted to the Company for the improvements to her property. Instead, the plaintiff took the position that the audit was not provided within the sixty-day period and was, therefore, not binding. The trial court concluded that a cashier's check is a negotiable instrument, and found that First American was not liable to the plaintiff because she dealt directly with the Bank, and therefore is not a holder in due course but instead is subject to the personal defense of failure of consideration. The trial court also concluded that even if First American had no right to dishonor the cashier's check, they owed the plaintiff nothing because First American was subrogated to the rights of the Company against the plaintiff, and the plaintiff was indebted to the Company for an amount in excess of the cashier's check.

The Court of Appeals affirmed the trial court decision, treating the cashier's check as an ordinary negotiable instrument, but pretermitted the issue of subrogation.

### DISCUSSION

■ We granted permission to appeal to consider an issue of first impression—whether, under Tennessee law, a bank may dishonor its cashier's check and defeat a later action for recovery by the payee with whom it has dealt directly by asserting the defense of failure of consideration. In this Court, the plaintiff asserts that cashier's checks are equivalent to cash and advocates the adoption of an absolute prohibition against dishonor of cashier's checks as the only option to preserve their continuing commercial utility. On the other hand, First American contends that a bank should be able to dishonor a cashier's check and assert the defense of failure of consideration in a later action for recovery by the payee of the cashier's check when the payee is not a holder in due course, or has dealt directly with the bank.

In Tennessee, as elsewhere, there are essentially two types of checks in general use: ordinary checks, which are drawn upon a bank by someone other than the bank; and

---

**1.** The total expended on the property improvements was $51,270.50. This was reduced by the plaintiff's voluntary payment of $26,694.06, leaving $24,576.44 still owing to the company. After crediting the amount of the check in escrow, $20,774.99, the plaintiff's remaining indebtedness, according to the Company, is $3,801.45.

bank checks, which is a general term that is used to refer to a variety of instruments, including cashier's checks. A cashier's check is a check drawn by a bank upon itself. Cashier's checks play a very significant role in commercial transactions because they avoid the risk and inconvenience that arises from the use of cash, yet they are commonly perceived as providing the same certainty and stability as cash. The public uses cashier's checks because they are a reliable vehicle for transferring funds, are as freely transferrable as cash, and are free of the risks of loss and theft that accompany cash. When used in place of a check or other negotiable instrument, the parties' expectation is that the cashier's check will remove all doubt as to whether the instrument will be returned to the holder unpaid due to insufficient funds in the account, a stop payment order, or insolvency. *See Warren Finance v. Barnett Bank,* 552 So.2d 194, 195–96 (Fla. 1989); Larry Lawrence, *Making Cashier's Checks and Other Bank Checks Cost–Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code,* 64 Minn. L.Rev. 275, 278 (1980) (hereinafter Lawrence, 64 Minn.L.Rev. at ——.).

Although the Uniform Commercial Code ("U.C.C.") as adopted in Tennessee and most other states provides many detailed rules that govern the legal rights of parties to a check, the U.C.C. gives no special guidance as to the treatment of cashier's checks and contains no definitive answer to the question of whether a bank has the right to dishonor its own cashier's check.[2] Despite the U.C.C.'s oversight, courts in other jurisdictions, as well as commentators considering the issue, have analyzed the issue by using provisions of the Code which are not by their terms applicable to cashier's checks, and which do not take into account the special commercial attributes of cashier's checks. As a result, it is not surprising that courts have developed different approaches to the issue.

A majority of commentators and a number of courts, including the Court of Appeals in this case, have concluded that cashier's checks should be treated as ordinary negotiable instruments.[3] Courts adopting this approach determine a bank's liability on a cashier's check by reference to the U.C.C. provisions governing the liability of obligors on notes and ordinary checks, codified at Tenn. Code Ann. §§ 47–3–305 and 306. If the "ordinary negotiable instrument" approach were applied to the facts of this case, the analysis would turn upon the fact that under Tenn. Code Ann. § 47–3–305(2), even a holder in due course is subject to the defense of failure of consideration if it is asserted by a party with whom the holder has dealt.

An apparent majority of courts, however, have rejected the "ordinary negotiable instrument" approach, and opted instead for the "cash equivalent" approach whereby cashier's checks are treated as almost equivalent to cash.[4] The primary rationale for

**2.** Tennessee and thirty-nine other states continue to use the 1962 version of Articles 3 and 4 of the U.C.C. *See* Tenn.Code Ann. §§ 47–1–101 through 47–9–607 (1992) and Uniform Commercial Code, Table of Adopting Jurisdictions, 2 U.L.A. 1 (Supp.1992). The only reference to cashier's checks in that version of the Code is in a section enumerating the types of payment that collecting banks may take in settlement of an instrument. Tenn.Code Ann. § 47–4–211 (1992). Cashier's checks are not even mentioned in Article 3 which governs negotiable instruments.

**3.** *Rezapolvi v. First Nat'l Bank of Maryland,* 296 Md. 1, 459 A.2d 183 (1983); *John Deere Co. v. Boelus State Bank,* 233 Neb. 818, 448 N.W.2d 163 (1989); *Laurel Bank & Trust Co. v. City Nat'l Bank,* 33 Conn.Supp. 641, 365 A.2d 1222 (1976); *Sochaczewski v. Wilmington Sav. Fund Soc.,* 508 A.2d 895 (Del.Super.1986); *API Supply Co., Inc. v. Premier Bank,* 593 So.2d 660 (La.App. 1 Cir.

1991); *Seman v. First State Bank of Eden Prairie,* 394 N.W.2d 557 (Minn.App.1986); *Pulaski Chase Co–Op v. Kellogg–Citizens Nat.,* 130 Wis.2d 200, 386 N.W.2d 510 (App.1986); *TPO Inc. v. F.D.I.C.,* 487 F.2d 131 (3rd Cir.1973); *Banco Ganadero y Agricola v. Society Nat'l Bank,* 418 F.Supp. 520 (N.D.Ohio 1976). *See also* 6 Anderson, *Uniform Commercial Code,* § 3–410:11 (3d ed. 1993) (hereafter Anderson at ——.); 2 James J. White & Robert S. Summers, *Uniform Commercial Code,* § 14–10 (3d ed. 1988) (hereafter White & Summers at ——.).

**4.** *Meador v. Ranchmart State Bank,* 213 Kan. 372, 517 P.2d 123 (1973); *State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14 (Mo.1976) (en banc); *Wertz v. Richardson Heights Bank & Trust,* 495 S.W.2d 572 (Tex.1973); *Crunk v. State Farm Fire & Cas. Co.,* 106 Wash.2d 23, 719 P.2d 1338 (1986); *Able & Associates v. Orchard Hill Farms,* 77 Ill.App.3d 375, 32 Ill.Dec. 757, 395

this approach was explained by the New Jersey Supreme Court in the leading case of *National Newark & Essex Bank v. Giordano*, as follows:

> A cashier's check circulates in the commercial world as the equivalent of cash. People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. In effect the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it to cash.

Id., 111 N.J.Super. 347, 268 A.2d 327, 329 (Law Div.1970) (internal citations omitted). Although no U.C.C. provisions lend direct support for the "cash equivalent" approach, some courts adopting it quote the widely accepted rule that a cashier's check is accepted upon issuance and cite the U.C.C. provision codified at Tenn.Code Ann. § 47–4–303(1)(a), which basically provides that a stop payment order comes too late if received after the bank has accepted or certified an item. From these two rules, the courts reason that a bank may not refuse to honor or stop payment on a cashier's check because it is accepted upon issuance.

Both the "ordinary negotiable instrument" and "cash equivalent" approaches, which have relied on U.C.C. provisions, have drawn criticism. For instance, one commentator has noted that the reasoning of the "ordinary negotiable instrument" theory, though seductive, is flawed because the U.C.C.Code sections from which it supposedly gains support were not designed to govern cashier's checks. Likewise, the "cash equivalent" theory has been criticized because some courts rely on Code provisions that govern a bank's liability to its customer for failing to stop payment on a check and, therefore, require the bank, as drawer and drawee of a cashier's check, to be liable to itself for failure to stop payment.[5]

We agree with the conclusion and underlying rationale of those courts that have adopted the cash equivalent approach without reliance on the criticized provisions of the U.C.C. Instead, we look to the nature and purpose of cashier's checks generally. As was aptly stated by the New Jersey court,[6] cashier's checks are commonly perceived and circulate in the commercial world as cash. The potential for uncertainty in commercial transactions is greatly increased by a rule that treats cashier's checks as ordinary negotiable instruments. We agree with Professor Lawrence that

> [i]f cashier's checks are to serve as cash substitutes, it is essential that banks be denied the ability to raise defenses against holders with whom they have dealt. By demanding a cashier's check, the holder has bargained to shift to the issuing bank the risk of litigation and the accompanying loss of the use of funds. Allowing a bank to raise defenses in an action for payment of a cashier's check nullifies this bargained-for shifting of risks. If the bank had paid the holder in cash, or if the

N.E.2d 1138 (1979); *First Financial v. First American Bank*, 489 So.2d 388 (La.App. 5 Cir. 1986); *Lowe's of Sanford v. Mid–South Band & Trust Co.*, 44 N.C.App. 365, 260 S.E.2d 801 (1979); *National Newark & Essex Bank v. Giordano*, 111 N.J.Super. 347, 268 A.2d 327 (Law Div. 1970); *The Moon Over The Mountain, Ltd. v. Marine Midland Bank*, 87 Misc.2d 918, 386 N.Y.S.2d 974 (N.Y.Civ.Ct.1976); *Abilities, Inc. v. Citibank, N.A.*, 87 A.D.2d 831, 449 N.Y.S.2d 242 (1982); *Yukon Nat'l Bank v. Modern Builders Supply, Inc.*, 686 P.2d 307 (Okl.App.1984); *Sainz Gonzalez v. Banco De Santander–Puerto Rico*, 932 F.2d 999 (1st Cir.1991); *Swiss Credit Bank v.*

*Virginia Nat'l Bank–Fairfax*, 538 F.2d 587 (4th Cir.1976); *Munson v. American Nat'l Bank & Trust Co.*, 484 F.2d 620 (7th Cir.1973); *Pennsylvania v. Curtiss Nat'l Bank*, 427 F.2d 395 (5th Cir.1970); *Da Silva v. Sanders*, 600 F.Supp. 1008, 1013 (D.D.C.1984); *Kaufman v. Chase Manhattan Bank*, 370 F.Supp. 276 (S.D.N.Y. 1973).

5. Lawrence, 64 Minn.L.Rev. at 288–290.

6. *National Newark & Essex Bank v. Giordano*, 268 A.2d at 329.

holder had already cashed the cashier's check, the bank would have the burden of commencing legal proceedings to resolve any problem and the holder would retain the use of his funds during the pendency of the suit. Ideally, a bank should be compelled to pay the holder of a cashier's check upon presentment, and then sue the holder in a separate action. The injustice that may result by requiring a bank to pay the check, although it may have grounds for complaint against the holder, is a risk that banks must assume when they issue cashier's checks.

Lawrence, 64 Minn.L.Rev. at 297 (footnote omitted).

As we have said, the U.C.C. as adopted in Tennessee provides no specific guidance on this issue, but we look to its general purposes which are "to simplify, clarify and modernize the law governing commercial transaction," and "to permit the continued expansion of commercial practices through custom, usage and agreement of parties."[7] We are convinced that the cash equivalent approach furthers those purposes. Accordingly, we conclude that a bank has no right to dishonor a cashier's check, but must proceed to recover on a cashier's check that has been mistakenly issued as it would if it had mistakenly paid cash. This approach affords to the bank a right similar to the common law right that banks retain under the Code to recover money paid under a mistake,[8] and it is consistent with Tenn.Code Ann. § 47–4–407 (1992), which provides that a payor bank is subrogated to the rights of the drawer or maker

against the payee of an instrument that is mistakenly paid over a stop payment order.[9]

■ Applying the cash equivalent approach to the facts of this case, it is clear that First American had no right to refuse to honor the cashier's check it issued to the plaintiff in payment of the Company's personal check. In this case, we agree with the trial court that, by statute, First American is clearly subrogated to the rights of the Company, the drawer of the check, against the payee, the plaintiff,[10] and that the plaintiff was indebted to the Company in an amount in excess of the amount of the check given First American as consideration for the cashier's check. Accordingly, we agree with the result reached by the trial court holding that First American owes the plaintiff nothing.[11]

### CONCLUSION

We conclude that the unique nature of a cashier's check requires a per se rule prohibiting a bank from refusing to honor its cashier's check. When a cashier's check is issued by mistake, such as it was in this case, the bank is liable for the cashier's check and must bring suit to recover as if it had mistakenly paid cash. Nevertheless, we agree with the trial court that the bank's subrogation to the Company's claim against the plaintiff results in no recovery for the plaintiff, since the sum plaintiff owes the Company is in excess of the amount the bank owes the plaintiff for the cashier's check. The judgment of the Court of Appeals is affirmed on the separate grounds set out. Other issues raised in this

7. Tenn.Code Ann. § 47–1–102(2) (1992).

8. See comment 8, Tenn.Code Ann. § 47–4–403 (1992) and Tenn.Code Ann. § 47–1–103 (1992).

9. **47–4–407. Payor bank's right to subrogation on improper payment.**
   If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights:
   (a) of any holder in due course on the item against the drawer or maker; and

(b) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and
(c) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose.

10. Tenn.Code Ann. § 47–4–407(c) (1992) at note 26, *supra*.

11. Although implicit in our holding, we specifically reject the plaintiff's claim on appeal that even assuming she owed the money, the Company had no right to claim it because the audit was not performed within the sixty day period.

appeal are pretermitted. Costs are taxed to the plaintiff, Julia Locke Stringfellow.

REID, C.J., and DROWOTA, O'BRIEN, and BIRCH, JJ., concur.