Napoleon T. ARLINE, Jr., Administrator
of the Estate of Napoleon T. Arline,
Deceased, Appellant,

v.

OMNIBANK, N.A., Appellee.

No. A14–94–00031–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 23, 1995.

Rehearing Overruled March 16, 1995.

Ann Chaffin, for appellant.

Marilyn K. Scanlan, Joy M. Soloway, for appellee.

Before ANDERSON, HUDSON and SEARS, JJ.

## OPINION

HUDSON, Justice.

Napoleon Arline, Jr., appellant, as administrator of his father's estate, filed suit against Omnibank, appellee, for breach of contract and conversion of funds deposited by his father in a joint account. The trial court granted Omnibank's motion for summary judgment, and Arline appeals. We reverse the trial court's judgment and render judgment in favor of appellant.

The material facts are not in dispute. Before his death, Napoleon T. Arline, Sr. maintained a joint account at Omnibank with his sister, Georgia Griffin. The signature card for the account stated that the funds in the account should be paid to "either of the undersigned regardless of the original ownership of the funds so deposited," and that "[i]n the event of the death of either person, the funds shall be payable to the survivor, and in the event of the death of the survivor, the funds shall be payable to the administrator, executor, heirs, assigns or legal successors of such survivor...."

The senior Arline died on December 10, 1990, with $31,108.27 in the Omnibank account. After Arline's death, Griffin continued to make deposits and withdrawals from the account. When Griffin presented a death certificate as evidence of Mr. Arline's death, Omnibank prepared a new signature card agreement on January 29, 1991, omitting the name of Napoleon T. Arline, and creating a new joint account between Griffin and a Ms. Shirley Andrews. There was, at that time, $25,384.54 on deposit in the account.

On February 26, 1991, appellant was appointed administrator of his father's estate. On February 27, 1991, he appeared with counsel at Omnibank where he intended to open an account on behalf of the estate. For reasons not apparent from the record, appellant was unable to open an account at Omnibank, and he asked Omnibank to issue a cashier's check for the balance in his father's account. By mistake, Omnibank issued a cashier's check for $25,524.12, the balance in Griffin's account, payable to "Napoleon T. Arline, Jr. Administrator of the Estate of Napoleon T. Arline, Deceased." Omnibank discovered its error later that day, and immediately telephoned the office of appellant's counsel to explain its mistake.

The following day, a senior vice-president of Omnibank told appellant's attorney that Arline's account "was a joint tenancy with a right of survivorship," and that "upon the death of Mr. Arline Sr., all interest in the proceeds transferred immediately to Georgia Griffin." Omnibank also informed appellant's counsel the cashier's check would not be honored and Omnibank was placing a "stop payment order" on the check. Appellant contends that he subsequently attempted to deposit the check at two other banks, but the banks refused to accept the cashier's check. He finally presented the check to Omnibank for payment, but it was again refused. At the request of appellant's counsel, the cashier's check was stamped "payment stopped."

Both parties filed motions for summary judgment in the trial court. Arline claims a bank cannot "stop payment" on its own cashier's check, and that Omnibank had no authority to remove his father's name from the joint account. In its motion for summary judgment, Omnibank contends a bank may assert whatever defenses it may have to paying its own cashier's check when there is no holder in due course and no one has changed his position in reliance upon the check. Omnibank also argues that the money passed to Griffin by a right of survivorship and that Omnibank was authorized to remove the deceased's name from the signature card.

As with any appeal from summary judgment, our review is limited to issues expressly presented to the trial court by written motion, answer or other response. TEX.R.CIV.P. 166a. When both parties move for summary judgment and only one party's motion is granted, an appellate court may determine all questions the parties presented to the trial court in the motions, including the propriety of overruling the opposing party's motion for summary judgment. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). An appellate court may render judgment for the losing party only if the party assigns a point of error to the court's denying his own motion for summary judgment. *CRA., Inc. v. Bullock*, 615 S.W.2d 175, 176 (Tex.1981). In this case, the judgment does not state the grounds for which summary judgment was granted in favor of the appellee; therefore, the judgment could be affirmed on any meritorious ground set forth in the motion. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989). Summary judgment is inappropriate if there is a genuine issue of material fact regarding any essential element of either party's motion for summary judgment. *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–49 (Tex.1985). Having examined the summary judgment evidence and having concluded that there is no such factual issue, we now examine the character of cashier's checks and the merits of the legal arguments advanced by both sides.

An ordinary check is a draft (or bill of exchange) drawn upon a bank payable upon demand. TEX.BUS. & COM.CODE ANN. § 3.104(b) (Vernon 1994). The value of such an instrument rests upon the character of the drawer and any coercive persuasion which may be derived from the threat of criminal prosecution. Being nothing more than the order of the maker or drawer directing the bank to pay the payee, the check is subject to recision by the drawer, and the bank or drawee is not liable upon the check until it has "accepted" the same in writing. *See* TEX.BUS. & COM.CODE ANN. §§ 3.409 & 3.410 (Vernon 1994); *Galaxy Boat Mfg. Co. v. East End State Bank*, 641 S.W.2d 584, 586 (Tex. App.—Houston [14th Dist.] 1982, no writ).[1] Not until the check has been accepted, is payment finally assured "in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." TEX.BUS. & COM.CODE ANN. § 3.418 (Vernon 1994).

To avoid the inherent uncertainty and suspicion regarding ordinary checks, the parties in many commercial transactions rely upon the relative security of "cashier's checks." Accepted with almost the same confidence as cash, cashier's checks have long played a vital role in "closing" important transactions. Any erosion of this confidence by permitting banks to dishonor their cashier's checks would, of course, be detrimental to commerce. On the other hand, one of the principal reasons cashier's checks are used in lieu of cash is because they are thought to offer protection against theft and fraud. If a bank has no ability to dishonor a cashier's check, then the remitter might just as well be served by using cash instead. In determining whether the trial court erred in granting Omnibank's motion for summary judgment, we must first decide whether a defense can ever be asserted by a bank to justify its decision to refuse payment on one of its cashier's checks.

Courts and commentators appear to be badly split on the issue of whether a bank is *always* required to honor its cashier's checks.[2] This division seems, in part, to be

---

1. Of course, receipt and payment of the check also constitutes "acceptance." *United States Fidelity & Guaranty Co. v. Jacobs*, 287 S.W. 504 (Tex.Civ.App.—Waco 1926, no writ); TEX.BUS. & COM.CODE ANN. § 4.213 (Vernon 1994).

2. The majority of courts have adopted a "cash equivalent" test and have concluded that a bank may not assert its own defenses to payment of one of its cashier's checks. *Compare Hotel Riviera, Inc. v. First Nat'l Bank & Trust Co.*, 768 F.2d 1201, 1203–04 (10th Cir.1985); *Swiss Credit*

*Bank v. Virginia National Bank–Fairfax*, 538 F.2d 587, 588 (4th Cir.1976); *Munson v. American National Bank & Trust Co.*, 484 F.2d 620, 623–24 (7th Cir.1973); *First Fin. L.S.L.A. v. First Am. Bank & Trust Co.*, 489 So.2d 388, 391 (La.App.), writ denied, 492 So.2d 1217 (La.1986); *National Newark & Essex Bank v. Giordano*, 111 N.J.Super. 347, 268 A.2d 327 (1970); *Stringfellow v. First American National Bank*, 878 S.W.2d 940, 944 (Tenn.1994).

Other courts, however, have concluded that on very limited occasions, banks may dishonor their

the result of confusion regarding whether a cashier's check is a "note" or a "draft." By statute, a cashier's check appears to be a promissory note.[3] The Texas Supreme Court, however, like a majority of states, has concluded that a cashier's check is a draft or bill of exchange. The court declared in *Wertz v. Richardson Heights Bank and Trust*, 495 S.W.2d 572, 574 (Tex.1973), that "[a] cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank."

The defenses available to the "maker of a note" and the "acceptor of a draft" are not materially different, and thus the nature of cashier's checks would not at first seem to be significant. However, there has been much criticism of viewing cashier's checks as accepted drafts.[4] The complaint is that when a cashier's check is deemed to be a draft which has been "accepted" upon issuance, it is tempting to apply section 4.303 of the Texas Business and Commerce Code and conclude that once a cashier's check has been issued it is "too late" to stop payment.[5] Indeed, the supreme court made reference to this section of the code when it concluded:

> ... a stop order, whether or not effective under other rules of law to terminate or suspend the bank's right or duty to pay an item, comes too late to terminate or suspend such right or duty if it is received after the bank has accepted or certified the item. Since a cashier's check is accepted when issued, Sec. 4.303, *supra*, has the effect of preventing a bank to stay payment on a cashier's check once it has been issued.

*Wertz v. Richardson Heights Bank & Trust*, 495 S.W.2d at 574.

In *Wertz*, the supreme court observed that the court of civil appeals based its reversal of the trial court's judgment on two erroneous conclusions: (1) a cashier's check, like an

---

own cashier's checks. *See International Furniture Distributors, Inc. v. First Georgia Bank*, 163 Ga.App. 765, 294 S.E.2d 732, 733 (1982) (holding that where remitter paid for cashier's check with a personal check upon which a stop payment order had already been issued, the bank could assert the defense of failure of consideration and dishonor its cashier's check); *Rezapolvi v. First National Bank of Maryland*, 296 Md. 1, 459 A.2d 183, 189 (1983) (agreeing with cases holding that a bank may dishonor its cashier's check where the holder is not a holder in due course and the check was obtained by fraud or under other circumstances where no consideration was given for the check); *State Bank of Brooten v. American National Bank of Little Falls*, 266 N.W.2d 496, 499 (Minn.1978) (adopting rule that a bank may refuse payment on its own cashier's check if it is not in the hands of a holder in due course); *Environmental Quality Research, Inc. v. Boatmen's National Bank of St. Louis*, 775 S.W.2d 199, 204 (Mo.Ct.App.1989, app. denied) (holding that a bank may assert its own defenses to payment of a cashier's check). *See Warren Finance, Inc. v. Barnett Bank of Jacksonville*, 552 So.2d 194 (Fla.1989) for a thorough discussion of the split of authority regarding whether a bank may assert its *own* defenses when dishonoring its cashier's check.

3. "A draft drawn on the drawer is effective as a note." Tex.Bus. & Com.Code Ann. § 3.118(1) (Vernon 1994). By definition, a cashier's check is a bank's own draft or "check drawn on itself and signed by the cashier or other authorized official." Black's Law Dictionary 237 (6th ed. 1990).

4. Brian J. Davis, *The Future of Cashier's Checks Under Revised Article 3 of the Uniform Commercial Code*, 27 Wake Forest L.Rev. 613 (1992); David J. Benson, *Stop Payment of Cashier's Checks and Bank Drafts Under the Uniform Commercial Code*, 2 Ohio N.U.L.Rev. 445 (1975).

5. Several courts have rejected this contention and concluded that § 4.303 relates only to a *customer's* right to "stop payment" under Tex. Bus. & Com.Code Ann. § 4.403 (Vernon 1994) and has no applicability where the *bank* chooses to assert its own defenses against payment. For example, in *Farmers & Merchants State Bank v. Western Bank*, 841 F.2d 1433, 1440 (9th Cir. 1987), the court concluded:

> [Section 4.303] was simply not intended to govern a bank's ability to assert its own defenses to liability on a cashier's check. As have other courts applying § 4–303(1) in this context, the district court triggered the section by characterizing [the appellee's] dishonorment of its cashier's check as a "stop payment." However, the reference in § 4–303(1) to a "stop order received by" a bank relates to a customer's effort to stop payment of an item drawn on the customer's account and has no application to an instrument drawn by a bank upon itself. It is apparent from the text of § 4–303 and the accompanying comments that the section was drafted for the purpose of settling the relative priorities of conflicting claims to a *customer's account*, and not for the purpose of cutting off a bank's right to assert its own defenses against an instrument.

ordinary check, is executory in its nature and revocable at any time before the bank has paid it, and (2) Wertz was not a holder in due course. The supreme court examined the holding of the court below, repudiated both "prongs" of the decision, and affirmed the judgment of the trial court. The supreme court undoubtedly sought to emphatically dispel the notion that a cashier's check is no different from an ordinary check. It is not certain, however, that the court also intended by its decision that a bank may *never* dishonor one of its cashier's checks. Unfortunately, the court has had no occasion to revisit the issue in more than two decades, and we must be guided by the court's unqualified declaration that a cashier's check is "not subject to countermand by either its purchaser or the issuing bank." *Wertz*, 495 S.W.2d at 574.

■ Omnibank contends that while section 4.303 may prevent it from dishonoring a cashier's check at the request of its customer, it is not prevented from asserting its own defenses to payment. For example, "[w]ant or failure of consideration is a defense as against any person not having the rights of a holder in due course,"[6] and Omnibank argues that there was a failure of consideration in this case because all of the money in the account passed by "right of survivorship" to Griffin and no money remained to support the "sale" of its cashier's check to Arline.[7] The signature card agreement, however, does not purport to alter *ownership* of the funds at the death of either signatory.[8] Rather, the agreement merely authorized the

bank to *pay* some or all of the money to either signatory upon his or her request before death. After the death of one signatory, the bank was authorized to pay the money to the surviving signatory, but the signature card agreement did not create a "right of survivorship." The estate retained its "beneficial ownership" in that portion of the money belonging to the deceased at the time of his death. It cannot be said, therefore, that there was a failure of consideration in this case due to the terms of the signature card agreement.

Omnibank also contends that when it prepared a new signature card for the account, it effectively "paid" the money to Griffin. According to the terms of the signature card agreement, Omnibank was authorized to deliver all of the money in the account to Griffin upon demand. Both parties agree that Omnibank could have paid Griffin with cash, by check, or by transferring the money into a new account created for Griffin bearing a new account number. Omnibank argues that even though the account bore the original number, the creation of the "new" account constituted a transfer of funds from the "old" account to the new account and this "transfer" constituted "payment." Omnibank claims that since the money had been paid to Griffin, there was no consideration to support the issuance of the cashier's check to Arline. We do not agree that the alteration of the signature card agreement constitutes "payment."[9]

---

6. Tex.Bus. & Com.Code Ann. § 3.408 (Vernon 1994).

7. The signature card stated, in pertinent part: In the event of the death of either person, the funds shall be payable to the survivor, and in the event of the death of the survivor, the funds shall be payable to the administrator, executor, heirs, assigns or legal successors of such survivor, and at all time, the funds in this account, in whole or in part, shall be paid by the Bank to either of the undersigned regardless of the original ownership of the funds so deposited.

8. The distinction between a "right of survivorship" and an authorization to transfer funds to the survivor is set forth in *Chopin v. Interfirst Bank Dallas NA*, 694 S.W.2d 79, 84 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Compare *McNeme v. Estate of Hart*, 860 S.W.2d 536, 540 (Tex.App.—El Paso 1993, no writ), where signature card created a right of survivorship, and

contrast it with decisions where courts found no right of survivorship, as in *Stauffer v. Henderson*, 801 S.W.2d 858 (Tex.1990); *Martinez v. Martinez*, 805 S.W.2d 873 (Tex.App.—San Antonio 1991, no writ); and *Chopin v. Interfirst Bank Dallas NA*, 694 S.W.2d 79 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). In *Ivey v. Steele*, 857 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1993, no writ), this court considered multiple accounts and distinguished between those which did and did not have a right of survivorship. *See also* Tex.Prob.Code Ann. § 439A (Vernon Supp. 1995).

9. While either party to a joint account may withdraw all of the funds, neither party may unilaterally remove the name of the other person from the account. *See* Op.Tex.Att'y Gen. No. DM–10 (1991). We know of no reason the death of one party should alter this principle.

■ However, even if the execution of a new signature card constituted payment of the money to Griffin, Omnibank cannot assert "failure of consideration" as a defense. While it may seem harsh to hold that a bank may *never* dishonor its own cashier's check, *stare decisis* dictates our course. The supreme court's opinion in *Wertz* clearly holds that a cashier's check is an "accepted" draft. In that case, the court interpreted section 4.303 to mean that "acceptance" of a draft prevents the drawee from subsequently refusing payment. The bank's defense in *Wertz*, as in the case *sub judice*, was a failure of consideration.

In *Wertz*, Baker stopped payment on a personal check several days before he gave it to Wertz in payment for a debt. Wertz made repeated inquiries on successive days to the drawing bank about the validity of the check. Each time the bank informed Wertz that the check was not good. One day, a teller mistakenly informed Wertz that Baker's check was good. Wertz immediately exchanged the personal check for a cashier's check and promptly deposited it in his business account. Since Baker possessed the right to stop payment on his personal check,[10] the bank was in no position to charge his account.

Although the bank received no *actual* consideration for the cashier's check, the supreme court employed the legal fiction that "Baker's check ... formed the consideration for the cashier's check." *Wertz*, 495 S.W.2d at 574. More importantly, the court's decision does not rest on the issue of consideration. Rather, the tenor of the supreme court's decision in *Wertz* is that a cashier's check, having been accepted at issuance, must always be honored by the issuing bank. This rationale is, as we have previously noted, what other jurisdictions have termed the "cash equivalent" test, and it is not predicated upon receipt of consideration or value for the check.

Omnibank argues that *Wertz* is distinguishable because Wertz, unlike Arline, was a holder in due course. Omnibank suggests that Arline is not a holder in due course because he did not take the instrument for value. In other words, the failure of consideration precludes any finding that Arline was a holder in due course. We have already found that there was not a failure of consideration because (1) there was no right of survivorship created by the signature card agreement and (2) the funds in the joint account were not "paid" to Griffin when the signature card was altered. "A holder in due course is a holder who takes the instrument (1) for value; and (2) in good faith; and (3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." TEX.BUS. & COM.CODE ANN. § 3.302(a) (Vernon 1994). We cannot say that Arline failed to give "value" for the cashier's check.

The result reached in *Wertz* was not dependent upon the supreme court's conclusion that Wertz was a holder in due course. Rather, the court's decision seems to have been based on two wholly independent grounds. Even if the court had concluded that Wertz was not a holder in due course, we are convinced that the supreme court would not have reached a different result in that case. Under a strict "cash equivalent" test, the payee of a cashier's check is entitled to rely upon the instrument to the same degree as he would cash without regard to his status as a holder in due course.

Finally, Omnibank contends that Arline should not be permitted to take advantage of a banking error. Omnibank argues that it had already "transferred" the funds in the account to Griffin, and the issuance of the cashier's check was clearly a mistake. Omnibank notified Arline immediately, and no person changed his position in reliance upon the cashier's check. In weighing these equitable considerations, we note that in *Wertz* the bank also issued a cashier's check by mistake. The supreme court succinctly held that the bank could not dishonor its cashier's check. The public policy considerations which support this holding require a consistent application of the "cash equivalent" test without regard to the equities which may arise in individual scenarios. The Supreme Court of Tennessee, which has also adopted

---

10. TEX.BUS. & COM.CODE ANN. § 4.403 (Vernon     1994).

the "cash equivalent" test has summarized the rule as follows: "When a cashier's check is issued by mistake, such as it was in this case, the bank is liable for the cashier's check and must bring suit to recover as if it had mistakenly paid cash." *Stringfellow v. First American National Bank,* 878 S.W.2d 940, 945 (Tenn.1994).

The issue of whether a bank can dishonor its cashier's check when no person has changed his position in expectation of payment is a difficult one. While there is a growing body of persuasive law in other jurisdictions which would support the trial court's judgment, *Wertz* compels us to reach a contrary holding. Having accepted the check upon issuance, Omnibank's cashier's check was the functional equivalent of cash. We are obliged to hold that it could not dishonor its cashier's check regardless of whether it was issued by mistake, unsupported by consideration, or held by one who was not a holder in due course. Accordingly, the trial court's judgment is reversed, and judgment is rendered in favor of appellant.