## KAMAL H. REZAPOLVI *v.* FIRST NATIONAL BANK OF MARYLAND

[No. 171, September Term, 1981.]

*Decided April 25, 1983.*

*Motion for reconsideration filed May 25, 1983; denied May 26, 1983.*

The cause was argued before MURPHY, C. J., and ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*James Robert Miller,* with whom were *Miller & Steinberg* on the brief, for appellant.

*C. Lamar Garren,* with whom were *Piper & Marbury* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

The dispute in this case concerns the right of a bank to dishonor its own cashier's check.

Kamal Rezapolvi entered into a "Preliminary Agreement" with R. Gordon Loetz, Sr., the president and owner of Columbia Marketing Corporation, for the purchase of a restaurant franchise. Pursuant to this agreement, in October 1977, Rezapolvi paid Loetz a total of $13,622 as a deposit. According to the uncontradicted testimony, after Loetz failed to find a location for the franchise within 30 days, as provided by the contract, and after Loetz raised the price of the franchise from $40,000 to $100,000, Rezapolvi requested that Loetz return his deposit. On December 1, 1977, Loetz personally delivered to Rezapolvi a check in the amount of $13,622. The check was drawn on Columbia Marketing's account with the First National Bank of Maryland. The check was signed by Stanley E. Lloyd, an employee of Columbia Marketing, whose signature was not an "authorized" signature for the Columbia Marketing account. Accompanying the check was the following letter:

"December 1, 1977

Kamal Relapolvi [sic]:

Inclosed [sic] you will find our check for $13,622.00 which represents your deposit for an Old Western Chicken 'N' Chips Restaurant. I am returning your deposit at your request. Mrs. Merhadi will be purchasing an Old Western Chicken 'N' Chips Restaurant this evening. This cancellation is contingent upon Mrs. Merhadi's participation.

Sincerely yours,

/s/

R. Gordon Loetz, Sr.

President

RGL/pd
encl: check"

4

The next morning, Friday, December 2, 1977, Rezapolvi brought the Columbia Marketing check to First National's branch in Bethesda, Maryland, where he endorsed the check in blank and exchanged it and a one dollar service charge for a cashier's check payable to himself.[1] Before issuing the cashier's check, the head teller checked Rezapolvi's identification, and determined that there was no stop payment order on Columbia Marketing's check and that Columbia Marketing's account contained sufficient funds to cover its check. The teller then placed a hold on those funds so that they could not be paid out on other items. The teller did not follow standard procedure and ascertain whether the Columbia Marketing check contained an authorized signature. Rezapolvi then deposited the cashier's check in his account at the American Security and Trust Company bank.

On Monday, December 5, 1977, Loetz, apparently unaware that the Columbia Marketing check had already been paid by a cashier's check, sent his secretary to First National's branch in Columbia, Maryland, for the purpose of placing a stop payment order on the Columbia Marketing check. Someone at First National's branch in Columbia contacted the manager of First National's Bethesda branch, Frances Manus, because the Bethesda branch had placed a hold on Columbia Marketing's funds in its account. Manus testified that she then contacted Loetz who stated that Columbia Marketing's check could not properly have been

---

1. The testimony at trial conflicted as to the conversation accompanying this transaction. Rezapolvi testified that he initially had asked the teller to cash the Columbia check, that the teller had obtained approval to cash it, that the teller was handing Rezapolvi the proceeds when she inquired whether he would prefer a cashier's check, to which he responded, "As long as the cashier check is cash money, it's all right with me," and that the teller thereupon issued a cashier's check, charging Rezapolvi a one dollar service charge. According to the teller, Rezapolvi did not ask her to cash the Columbia check but rather asked her to issue a cashier's check therefor. The trial court did not expressly or impliedly resolve this conflicting testimony in its findings of fact or decision.

paid because of insufficient funds. After being informed that Columbia Marketing had sufficient funds, Loetz replied:

> "Well, you ... still couldn't have [properly cashed the check] ... because someone else signed the check. I didn't sign the check. *I had someone else sign the check* ... I did intend to come into the Branch and give you new signature cards with this new person's [Stanley Lloyd's] signature and resolutions but there was a meeting and we just, you know, didn't get around to it." (Emphasis added.)

When Manus attempted to pursue the matter with Loetz, he responded, "Well, you know, I can't do anything about it.... I had someone else sign the check and you're the one that gave the money." Manus thereupon issued a stop payment order on the cashier's check and released the hold on Columbia Marketing's account.[2] A few days later, Rezapolvi received a telephone call from American Security and Trust Company informing him that First National had stopped payment on the cashier's check and that Rezapolvi could retrieve the cashier's check from an American Security and Trust Company office.[3] Subsequently, Rezapolvi telephoned Loetz and requested another check. Loetz replied, "Don't talk to me. I cancelled your contract, and I gave you a check. This is between you and your bank.... You got your check."

In November 1979, Rezapolvi commenced this action in the Circuit Court for Montgomery County, seeking damages from First National for its dishonor of its cashier's check. After a trial by the court, judgment was entered in favor of First National. Rezapolvi appealed to the Court of Special Appeals, and this Court issued a writ of certiorari prior to a decision by the Court of Special Appeals.

---

2. From the testimony at trial it seems that Columbia Marketing thereafter closed its account at First National, leaving no money in the bank.

3. First National has not returned either the Columbia Marketing check or the one dollar fee it had charged for its cashier's check to Rezapolvi. It is unclear from the testimony whether First National tendered the Columbia Marketing check to Rezapolvi after it dishonored its cashier's check.

6

# I

Preliminarily, it should be emphasized that two separate negotiable instruments are involved in this case — the Columbia Marketing check and First National's cashier's check. Furthermore, the parties to the checks differ with the exception of the plaintiff, Rezapolvi. Before turning to First National's specific argument as to why it was entitled to dishonor the cashier's check, we shall discuss more generally both negotiable instruments, dealing first with the Columbia Marketing check and second with the cashier's check.

# A.

The first instrument in this case, the Columbia Marketing check, was accepted and paid prior to Columbia Marketing's attempted stop payment order. Although acceptance and payment are normally viewed as separate events, if a check has been paid it has clearly been accepted. First National accepted and paid the Columbia Marketing check when it issued its cashier's check in return for the Columbia Marketing check. The issuance of the cashier's check represented both a promise to pay the Columbia Marketing check and payment of the check. *See Citizens & Southern Nat. Bank v. Youngblood,* 135 Ga.App. 638, 219 S.E.2d 172, 173 (1975); *Page v. Holmes-Darst Coal Co.,* 269 Mich. 159, 162-165, 256 N.W. 840 (1934); *Friends in Need Society v. Peterson,* 9 S.W.2d 1110, 1111 (Tex. Civ. App. 1928). 2 *Bender's Uniform Commercial Code, Commercial Paper,* § 12.16[1] (W. Willier & F. Hart ed. 1982); *Brady on Bank Checks,* § 4.8 (H. Bailey 5th ed. 1979).

Furthermore, contrary to the assertion in First National's brief, the later nonpayment of the cashier's check did not change the fact that the Columbia Marketing check had been paid. "A holder who accepts a bank instrument on which the bank is obligor, such as a cashier's check or a bank draft, has . . . been paid whether or not the bank instrument is ever paid." 2 *Bender's Uniform Commercial Code,*

*Commercial Paper, supra,* at § 12.16[1]. *See* § 4-213 of the Uniform Commercial Code, Maryland Code (1975), § 4-213 of the Commercial Law Article, and Official Comment point 2 (Final payment does not depend on whether bank's remittance draft was itself paid).[4] *See also Brady on Bank Checks, supra,* at § 4-8. Under § 3-802 (1), "[u]nless otherwise agreed where an instrument is taken for an underlying obligation (a) the obligation is pro tanto discharged if a bank is drawer, maker or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor." When First National issued its cashier's check in exchange for the Columbia Marketing check, Columbia Marketing's obligation as drawer of its check was pro tanto discharged, and Rezapolvi would not be able to recover from Columbia Marketing on its check to him.

## B.

The traditional definition of a cashier's check has been set forth in a multitude of cases, both prior to and after the adoption of the Uniform Commercial Code. One leading opinion stated it as follows (*State of Pa. v. Curtiss Nat. Bank of Miami Springs, Fla.,* 427 F.2d 395, 398 (5th Cir. 1970)):

> "A cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank."

A recent decision of the United States Court of Appeals for the Fourth Circuit, holding that a bank was not entitled to dishonor its own cashier's check, and that the timeliness under the Uniform Commercial Code of the dishonor notice was immaterial, said (*Swiss Credit Bank v. Virginia Nat. Bank-Fairfax,* 538 F.2d 587, 588 (4th Cir. 1976)):

---

4. Hereafter all references to statutory sections will be to the Uniform Commercial Code as set forth in the Commercial Law Article.

"We see no need to reach the question of timeliness of the notice of dishonor. A cashier's check is a bill of exchange drawn by a bank upon itself. It is accepted in advance by the act of its issuance, and it cannot be dishonored by the issuing bank because of an indebtedness to it of one of its customers."

Also a "cashier's check, purchased for adequate consideration, unlike an ordinary check, stands on its own foundation as an independent, unconditional and primary obligation of the Bank." *State of Pa. v. Curtiss Nat. Bank of Miami Springs, Fla., supra,* 427 F.2d at 400. "[T]he general rule [is] that the act of issuing a cashier's check *binds* the issuing bank to pay the instrument and the bank is not allowed to stop payment on it." *Anderson, Clayton & Co. v. Farmers Nat. Bank, Etc.,* 624 F.2d 105, 109-110 (10th Cir. 1980). *See, e.g., TPO Incorporated v. Federal Deposit Insurance Corp.,* 487 F.2d 131, 135 (3d Cir. 1973); *Banco Ganadero y Agricola v. Soc. Nat. Bk., Cleve.,* 418 F.Supp. 520, 523 (N.D. Ohio 1976); *Kaufman v. Chase Manhattan Bank, National Ass'n,* 370 F.Supp. 276, 278 (S.D.N.Y. 1973); *Gillespie v. Riley Management Corporation,* 59 Ill.2d 211, 319 N.E.2d 753, 756 (1974); *Louis Falcigno Enterprises v. Mass. Bank,* 14 Mass.App. 92, 436 N.E.2d 993 (1982); *Thompson Poultry v. First Nat. Bank of York,* 199 Neb. 8, 255 N.W.2d 856, 858 (1977); *Santos v. First Nat'l State Bk. of N.J.,* 186 N.J.Super. 52, 451 A.2d 401, 407 & n. 10 (1982); *National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327, 328-329 (1970); *Dziurak v. Chase Manhattan Bank, N.A.,* 44 N.Y.2d 776, 377 N.E.2d 474, 406 N.Y.S.2d 30, 31 (1978); *Wertz v. Richardson Heights Bank And Trust,* 495 S.W.2d 572, 574 (Tex. 1973).

Moreover, courts have recognized and given effect to the public perception of a cashier's check. According to one court, "[a] cashier's check circulates in the commercial world as the equivalent of cash. . . . People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual." *National Newark & Essex Bank*

*v. Giordano, supra,* 268 A.2d at 329. The United States Court of Appeals for the Third Circuit has pointed to "the strong considerations of public policy favoring negotiability and reliability of cashier's checks." *TPO Incorporated v. Federal Deposit Insurance Corp., supra,* 487 F.2d at 135.

Although the traditional view is that a cashier's check is a draft or a bill of exchange drawn by the bank upon itself, there has been some disagreement by a few authorities concerning the classification of a cashier's check under the Uniform Commercial Code. While Article 3 of the Code, governing negotiable instruments, fails to even mention the term "cashier's check," [5] some recent authorities classify a cashier's check as a note because of § 3-118 (a) which states that "[a] draft drawn on the drawer is effective as a note." [6] Nevertheless, whether we label a cashier's check as a note or a draft is unimportant in the instant case because § 3-413 imposes equivalent obligations on the maker of a note, the acceptor of a draft and the drawer of a draft (once the draft has been dishonored).

"§ 3-413. Contract of maker, drawer and acceptor.

(1) The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement . . . .

(2) The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder or to any indorser who takes it up. . . ."

---

**5.** Article 4, governing bank deposits and collections, refers to cashier's checks only once, in § 4-211.

**6.** *See* TPO Incorporated v. Federal Deposit Insurance Corp., 487 F.2d 131, 136 (3d Cir. 1973) (applying New Jersey law) (stating that a cashier's check is a negotiable promissory note) *and* Laurel Bank & Trust Co. v. City Nat. Bank of Conn., 33 Conn.Supp. 641, 365 A.2d 1222, 1224 (1976) (same). *See also* 6E *Bender's Uniform Commercial Code, Reporter-Digest,* § 4-403 (A8., comment 1) (W. Willier & F. Hart ed. 1982).

The cited cases may be in error if they intend to conclude from the quoted language of § 3-118(a) that a draft drawn on a drawer may be treated only as a note. Section 3-118(a) arose from § 17(5) of the Negotiable Instruments Law. Section 17(5) provided that "[w]here the instrument is so ambiguous that there is doubt whether it is a bill or a note, the holder may treat it as either at his election." The provision was enacted for the benefit of the

Thus, regardless of whether First National's cashier's check is classified as a draft or a note, First National generally had the duty to honor the check. *See* 6E *Bender's Uniform Commercial Code, Reporter-Digest,* § 4-403 (A8., comment 1) (W. Willier & F. Hart ed. 1982).

Despite the language in some opinions suggesting that a bank may never dishonor its cashier's check,[7] courts have

---

holder to permit the holder to resort to those provisions of the Negotiable Instruments Law most advantageous to his position. *See* Funk v. Babbit, 156 Ill. 408, 41 N.E. 166 (1895). The Official Comment to § 3-118, point 2, indicates that the Code drafters intended to retain this advantage for the holder: "The language of the original Section 17 (5) is changed to make clear that the provision is not limited to ambiguities of phrasing, but extends to any case where the form of the instrument leaves its character as a draft or a note in doubt." Thus, if it is beneficial the holder may choose to treat the instrument as a note, *see, e.g.,* § 3-409 (1) ("Draft not an assignment") or as a draft, *see, e.g.,* § 3-410 (1). *See* Taylor v. Equitable Trust Co., 269 Md. 149, 156, 304 A.2d 838 (1973) (treating cashier's check as note for purposes of that case); *see also* Santos v. First Nat'l Bk. of N.J., 186 N.J.Super. 52, 451 A.2d 401, 409-410 & n. 22 (1982) (stating that "[o]ne solution [to the problem of § 3-118] is to treat cashier's checks as notes for some purposes and as other instruments, such as checks, for other purposes").

7. *See, e.g.,* Munson v. American National Bank & Trust Co. of Chicago, 484 F.2d 620, 624 (7th Cir. 1973); Kaufman v. Chase Manhattan Bank, National Ass'n, 370 F.Supp. 276, 278 (S.D.N.Y. 1973); Able & Associates v. Orchard Hill Farms, 77 Ill.App.3d 375, 395 N.E.2d 1138 (1979); National Newark & Essex Bank v. Giordano, 111 N.J. Super. 347, 268 A.2d 327 (1970); Moon Over the Mountain, Ltd. v. Marine Midland Bank, 87 Misc.2d 918, 921, 386 N.Y.S.2d 974 (Civ. Ct. 1976).

Some of these cases, after pointing out that a cashier's check is accepted upon issuance, have relied on § 4-303 of the Uniform Commercial Code to conclude that the acceptance absolutely precludes a later dishonor by the bank. *See, e.g.,* National Newark & Essex Bank v. Giordano, *supra,* 268 A.2d at 329. In our view, however, this reliance is misplaced. Section 4-303 reads in pertinent part:

"(1) Any knowledge, notice or stop-order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:

(a) Accepted or certified the item;"

* * *

Section 4-303 has no application in this context because the section concerns a customer's right to place a stop payment order on the customer's check and

recognized that a bank may do so under very limited conditions. These are where the holder has dealt with the bank in connection with the transaction or is not a holder in due course, *and* where the cashier's check was obtained by fraud upon the bank or, under certain circumstances, where there was no consideration given to the bank for the instrument. *See generally Anderson, Clayton & Co. v. Farmers Nat. Bank, supra,* 624 F.2d at 110; *Matter of Johnson,* 552 F.2d 1072, 1078 n. 5 (4th Cir. 1977); *TPO Incorporated v. Federal Deposit Insurance Corp., supra,* 487 F.2d at 136; *State of Pa. v. Curtiss Nat. Bank of Miami Springs, Fla., supra,* 427 F.2d at 399; *Banco Ganadero y Agricola v. Soc. Nat. Bk., Cleve., supra,* 418 F.Supp. at 523-524; *Laurel Bank & Trust Co. v. City Nat. Bank of Conn., supra,* 365 A.2d at 1224-1225; *Wilmington Trust Company v. Delaware Auto Sales,* 271 A.2d 41, 42 (Del. 1970); *Beach National Bank v. Bank of Hollywood Hills,* 256 So.2d 251, 252 (Fla. App. 1971); *International Furn. Dis. v. First Ga. Bank,* 163 Ga.App. 765, 294 S.E.2d 732 (1982); *Gillespie v. Riley Management Corporation, supra,* 319 N.E.2d at 756; *Travi Const. v. First Bristol Cty. Nat. Bank,* 10 Mass.App. 32, 405 N.E.2d 666, 668-669 (1980); *State Bank of Brooten v. Am. Nat. Bank,* 266 N.W.2d 496, 499 (Minn. 1980); *Santos v. First Nat'l State Bank of N.J., supra,* 451 A.2d at 406; *Thompson v. Bank,* 47 Ohio App.2d 249, 252-253, 353 N.E.2d 895 (1975); *Wertz v. Richardson Heights Bank and Trust, supra,* 495 S.W.2d at 574; *Neve Welch Enterprises, Inc. v. United Bank,* 628 P.2d 1295, 1296-1297 (Utah 1981).[8]

---

does not concern a bank's right to dishonor its own checks. *See* TPO Incorporated v. Federal Deposit Insurance Corp., *supra,* 487 F.2d at 136; Laurel Bank & Trust Co. v. City Nat. Bank of Conn., *supra,* 365 A.2d at 1224; State Bank of Brooten v. Am. Nat. Bank, 266 N.W.2d 496, 499 (Minn. 1978).

8. Cases permitting a bank to dishonor its cashier's check and assert certain defenses under the Code are consistent with pre-code cases. *See, e.g.,* National Bank of California v. Miner, 167 Cal. 532, 140 P. 27, 30 (1914) ("The defense of lack of consideration, therefore, was fully open to the appellant bank"); Tropicana Pools, Inc. v. First Nat. Bank of Titusville, 206 So.2d 48 (Fla. App. 1968) (payee not a holder in due course; therefore bank may countermand its cashier's check and assert failure of consideration as a defense); Wright v. Trust Co. of Georgia, 108 Ga.App. 783, 134 S.E.2d 457

Consequently, because Rezapolvi dealt with First National, the bank may assert its defenses against him.[9] Under the principles recognized in the above-cited cases, however, the only defenses which First National may assert as a basis for dishonor are its own; the bank may not rely upon the defenses of any third party such as Columbia Marketing. *See also* § 3-306 (d) ("The claim of any third person to the instrument is not . . . available as a defense to any party liable thereon . . ."); *Louis Falcigno Enterprises v. Mass. Bank, supra,* 436 N.E.2d at 993.

## II

Against this background, we shall now address First National's argument as to why it was entitled to dishonor its cashier's check. The bank contends that the "unauthorized" signature on the Columbia Marketing check rendered it not properly payable and that, for this reason, the Columbia Marketing check furnished no consideration for the cashier's check. This argument must be rejected for several reasons.

*First,* there simply was no unauthorized signature for purposes of the Uniform Commercial Code. Section 1-201 (43) states that an " '[u]nauthorized signature or indorsement' means one made without actual, implied or apparent authority, and includes a forgery." In *Taylor v. Equitable Trust Co.,* 269 Md. 149, 156, 304 A.2d 838 (1973),

---

(1963); Kinder v. Fisher's Nat. Bank, 93 Ind.App. 213, 177 N.E. 904, 906 (1931) ("It has many times been held that a promissory note or a bill of exchange must be supported by a consideration, and that a plea of want or failure of consideration is a valid defense in an action between the original parties"); Mid-Central Towing Co. v. National Bank of Tulsa, 348 P.2d 327, 329 (Okla. 1959) ("If a bank issues a cashier's check without consideration, the failure of consideration is a matter of defense, and the bank may properly refuse to honor the cashier's check when presented for payment by the payee"); Dakota Trans. & Stor. Co. v. Merchants Nat. B. & T. Co., 86 N.W.2d 639 (N.D. 1957).

**9.** Whether or not Rezapolvi is a holder in due course of the cashier's check is immaterial in this case because, under § 3-305(2) (a), Rezapolvi took the instrument free from "[a]ll defenses of any party to the instrument with whom the holder has not dealt." As Rezapolvi dealt with First National in obtaining the check, he took it subject to the bank's defenses. Rezapolvi would take subject to the same defenses under § 3-306 (b) and (c) if he were not a holder in due course.

this Court, citing § 1-201 (43), pointed out that where the authority to sign an instrument was expressly given by a principal to an agent, or implied, or based on apparent authority, the signature was not an unauthorized one under the Uniform Commercial Code. The rule was the same before the adoption of the Code. *Trust Co. v. Subscribers, Etc.,* 150 Md. 470, 475-476, 133 A. 319 (1926); *Building Association v. Fisher,* 140 Md. 666, 670, 118 A. 164 (1922) (stating that "the signature of any party to a negotiable instrument may be made by 'a duly authorized agent,' that no particular form of appointment is necessary, and that 'the authority of the agent may be established as in other cases of agency'"). In the instant case, the evidence is uncontradicted that Loetz, the president and owner of Columbia Marketing, expressly authorized an employee to sign the Columbia Marketing check; in fact, he *directed* the employee to sign the check. While First National may have been entitled to decline payment of the Columbia Marketing check because the employee's name was not yet included on the signature card, the signature was nevertheless expressly authorized by the drawer. The Columbia Marketing check, which the bank paid, did not contain an unauthorized signature in light of § 1-201 (43).

*Second,* even if the agent's signature on the Columbia Marketing check had initially been unauthorized, Columbia Marketing clearly ratified the signature and would be estopped from asserting a lack of authority. A signature, although initially unauthorized, may be ratified by one with the power to sign, or the latter may be precluded from denying authority. *Taylor v. Equitable Trust Co., supra,* 269 Md. at 159-162; *Williams v. Johnson,* 261 Md. 463, 467-468, 276 A.2d 95 (1971); *Martin Co. v. Fidelity Bank,* 218 Md. 28, 32, 145 A.2d 267 (1958); *Union Trust Co. v. Soble,* 192 Md. 427, 431, 64 A.2d 744 (1949); *Trust Co. v. Subscribers, Etc., supra,* 150 Md. at 475-476. Under § 3-404, an unauthorized signature is operative as the signature of an authorized person if the latter ratifies it or is precluded from denying it,

and such ratification is "for all purposes of this title." [10] The uncontradicted testimony at trial concerning Loetz's conduct and statements, along with the letter accompanying the Columbia Marketing check, conclusively shows that Loetz ratified the signature of his employee.

*Third,* if we assume arguendo that the signature on the Columbia Marketing check was initially unauthorized and was not ratified, such lack of authority would not aid First National in this case. Under the rule of *Price v. Neal,* 3 Burr. 1354 (1762), as codified in § 3-417 (1) (b), a drawee who pays an instrument with an unauthorized signature is bound on his acceptance or payment unless the person presenting the instrument knew that the signature was unauthorized. [11] "[A] drawee of a draft is presumed to know the signature of his customer, the drawer." Official Comment to § 3-417, point 4. As previously discussed, First National paid the Columbia Marketing check when it issued its cashier's check. It is also clear that Rezapolvi had no knowledge that Stanley Lloyd's signature might have been unauthorized at the time Rezapolvi presented the Columbia Marketing check. Thus, under *Price v. Neal,* First National cannot avail itself of the defense of failure of consideration on the ground that the Columbia Marketing check contained an unauthorized signature that rendered it not properly payable.

---

10. Section 3-404 provides:

"§ 3-404. Unauthorized signatures.

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

(2) Any unauthorized signature may be ratified for all purposes of this title. Such ratification does not of itself affect any rights of the person ratifying against the actual signer."

*See also* Comments 2 and 3.

11. Section 3-417 provides in pertinent part:

"(1) Any person who obtains payment or acceptance ... warrants to a person who in good faith pays or accepts that

## III

Alternatively, First National asserts that even if it is liable on the cashier's check, it is entitled to recoup from Rezapolvi an equal amount of money under § 4-407 (c) of the Uniform Commercial Code. That section states:

"§ 4-407. Payor Bank's Right to Subrogation on Improper Payment.

If a payor bank has paid an item over the stop-payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights

(a) Of any holder in due course on the item against the drawer or maker; and

(b) Of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and

(c) Of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."

To come within § 4-407, First National must show that it paid the Columbia Marketing check either in spite of a timely stop payment order or "under circumstances giving a basis for objection" by Columbia Marketing. In addition, First National must show that Columbia Marketing had a valid claim against the payee Rezapolvi.

Section 4-407 affords no basis for recoupment because the bank neither paid the Columbia Marketing check over a

---

\* \* \*

"(b) He has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by a holder in due course acting in good faith . . . ."

stop-payment order nor paid it under circumstances giving a basis for objection by the drawer. First National does not dispute the fact that no stop payment order had been received when the Columbia Marketing check was paid. It claims, however, that the alleged unauthorized signature furnished the drawer with a valid ground for objection to the bank's payment of the Columbia Marketing check. But, for the reasons set forth in Part II above, Columbia Marketing had no valid basis for objecting to the payment of its check signed by an employee at the direction of its president and owner. See also § 3-406 (negligence of drawer or maker contributing to unauthorized signature); Note, *Forgeries and Material Alterations: Allocation of Risks Under the Uniform Commercial Code,* 50 B.U.L. Rev. 536, 543-551 (1970).[12]

Under the circumstances of this case, First National was not entitled to dishonor its cashier's check payable to Rezapolvi; nor was First National entitled to subrogation under § 4-407 (c). We therefore hold that Rezapolvi is entitled to damages because of First National's dishonor of its cashier's check.

> *Judgment of the Circuit Court for Montgomery County reversed.*
> *Case remanded to that Court for a determination of the appellant's damages and the entry of a judgment consistent with this opinion.*
> *Appellee to pay costs.*

---

12. The alleged "condition" associated with the cancellation of the franchise agreement between Columbia Marketing and Rezapolvi clearly would have furnished no basis for Columbia Marketing's objection to the payment of its check, and Columbia Marketing did not attempt to stop payment on this ground. The alleged condition (which was denied by Rezapolvi's testimony below) related to the cancellation of the franchise agreement. The check itself was not conditional, and it could not have been under the Code. See § 3-104(1) (b).