No. 97-368

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 93

AMERICAN FEDERAL SAVINGS
AND LOAN ASSOCIATION, n/k/a
AMERICAN FEDERAL SAVINGS BANK,

Plaintiff/
Appellant,

v.

MADISON VALLEY PROPERTIES
INC., and VALLEY BANK OF HELENA,

Defendants/Respondents.

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jock O. Anderson, Gough, Shanahan, Johnson & Waterman,
Helena, Montana

For Respondent:

Lance Lovell, Josephson & Fredricks, Big Timber, Montana

(Madison Valley Properties); R. J. "Jim" Sewell, Jr., Smith Law
Firm, Helena, Montana (Valley Bank)

Submitted on Briefs: April 2, 1998

Decided: April 30, 1998
Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    This is an appeal by American Federal Savings Bank (American) from the District Court's April 4, 1997 Order on Motion for Summary Judgment entered against American and in favor of Madison Valley Properties, Inc. (Madison).  Madison also cross-appeals from one of the court's rulings on its cross-motion for summary judgment.  We reverse the trial court's decision as to the issue on appeal; we affirm as to the issue on cross-appeal; and we remand for further proceedings and entry of a judgment consistent with this opinion.  Finally, we dismiss with prejudice as moot American's appeal of the summary judgment rendered in favor of Valley Bank of Helena (Valley Bank).

Background

¶2    The dispositive facts are not in dispute.  David Gauvin (David) operated a Helena excavation business.  In January 1991, American loaned David and his then wife, Marlene, nearly $32,000 evidenced by a promissory note and secured by  a 1989 Caterpillar backhoe (the collateral or the backhoe).  American properly perfected its security interest in the collateral in February 1991, by the filing of a financing statement with the Secretary of State.  David and Marlene divorced in 1992.

¶3    In the spring of 1994, David was injured and his loan, then paid down to under $14,000, went into default.  Following his accident, David advertised his business equipment, including the backhoe, for sale.  On July 5, 1994, representatives of Madison came to Helena, inspected the equipment, and agreed to purchase some of it, including the backhoe, for a total price of $35,000.  As a deposit, Madison left a check for $5,000 payable to David and to David's girlfriend, Debra White (Debra), with Debra.  Debra was acting on David's behalf, apparently as his attorney in fact.  Madison's representatives then returned home.  On that same day Debra called American and asked for and was given a current pay-off figure for David's loan.  Debra also advised American's employee, Jo Ann Jones (Jo Ann), that David would be selling the backhoe and paying off the loan.

¶4    On July 7, 1994, a representative of Madison returned to Helena and delivered to David and Debra a $30,000 check for the balance of the purchase price.  The check was payable to both David and Debra.  Madison had actual knowledge of American's perfected lien in David's equipment, and though instructed to obtain lien releases at the time of payment, Madison's representative failed to do so. Upon taking delivery of the $30,000 check, David and Debra drove from Helena to Bozeman where they cashed the check at a local bank.  The proceeds were paid to them in the form of $10,000 in cash to David and a $20,000 cashier's check payable to Debra.

¶5    The following day, July 8, David went to Valley Bank in Helena and presented the $20,000 cashier's check showing his and Debra's endorsements. He then negotiated this check and purchased from the proceeds a Valley Bank cashier's check payable to American for $13,703.31.  This check was in the

amount of and designated as the pay-off for his American loan.

¶6    That same day, the Valley Bank cashier's check was delivered to American by means  and person(s) undetermined. In any event, the check for the loan pay-off was on the desk of loan officer Della Ranard (Della) when she returned from lunch.  On finding the check, Della stamped "PAID" on the promissory note; executed a lien release to be sent to the Secretary of State; placed the note and lien release in envelopes for mailing; and deposited the envelopes with the enclosed documents in American's outgoing mail basket.

¶7    Later on July 8, however, Della received a call from Valley Bank. Valley Bank advised Della that Debra had notified the Bank that the $20,000 check from the Bozeman bank payable to her which David used to purchase the Valley Bank cashier's check payable to American was stolen and that her endorsement was forged by David.  Valley Bank requested Della to stop the pay-off of David's loan.  This Della did.  She then retrieved the note marked "PAID" and the lien release from the outgoing mail basket and wrote "Stamped in error" next to the "PAID" stamp on the note and thereafter regarded the note as still unpaid.  Subsequently, Valley Bank called again, and, at its request, Della returned the Valley Bank cashier's check to that institution.

¶8    On July 15, David and Debra went to Valley Bank. The District Court found that at that time Valley Bank learned that the original $20,000 check had not been stolen from Debra nor had her signature been forged.  In any event, Debra requested and obtained the return of her $20,000 check, and the two left the Bank for parts unknown.   American's loan was not repaid and its lien on the collateral purchased by Madison was not released (except to the extent that it was replaced by a cash bond filed by Madison as part of this litigation which cash bond has now been paid over to Madison as a result of the trial court's decision).

¶9    Subsequently, American sued David and Marlene to recover on the note.  American also sued Madison to recover possession of the collateral. Debra was added as a defendant in an amended complaint.  Madison counter-claimed seeking to quiet its title to the collateral it purchased from David as against American's perfected security interest.  Subsequently, by a second amended complaint, American joined Valley Bank as a defendant on the theory that, if American lost its rights in the collateral as against Madison, then American should be indemnified by Valley Bank.

¶10  Following discovery, American and Madison filed cross-motions for summary judgment.  After briefing and a hearing, the District Court ruled in favor of Madison and against American holding that Madison had superior rights in the collateral but that American had not agreed to David's sale of the collateral in a manner inconsistent with its security agreement.  American timely appealed and Madison cross-appealed.  American also appealed the court's summary judgment in favor of Valley Bank.

Issues

¶11  In American's appeal we address the issue of which party--American or Madison--has superior rights to the collateral in dispute.  By way of its cross-

appeal,
Madison raises the issue of whether American waived its rights under its written security agreement by acquiescing to David's sale of the collateral in a manner inconsistent with the terms of the security agreement.  We will address each of these issues in turn.  We also summarily dispose of American's appeal against Valley Bank.

### Standard of Review

¶12  This case is on appeal from the trial court's decision on cross-motions for summary judgment filed by American and by Madison.  Our standard of review in appeals from a district court's summary judgment ruling is de novo; we apply the same criteria and evaluation as the district court based on Rule 56, M.R.Civ.P.  The initial burden is on the movant to demonstrate that there exist no genuine issues of material fact.  That having been accomplished, the burden then shifts to the non-moving party to show, by more than mere denial and speculation, that genuine issues of material fact do exist.  If the court concludes that there are no genuine issues of material fact, then it must determine whether the moving party is entitled to judgment as a matter of law.  Our review of the court's legal conclusions is plenary.  Montana Public Emp. Assoc. v. Dept. of Transportation, 1998 MT 17, ¶ 8, ___ Mont. ___, ¶ 8, ___ P.2d ___, ¶ 8, 55 St. Rep. 60, ¶ 8 (citations omitted).  In the case at bar, since the facts are not disputed, we need only determine whether the District Court's application of the law to these facts is correct.

### Discussion

¶13  The ultimate question to be answered in every commercial transaction gone bad is: "Who is to bear the loss; who will be the 'stuckee'?"  In the instant case, the trial court determined that party to be American.  In so ruling, the court reasoned that American had not in any way consented to David's sale of the collateral as contemplated by § 30-9-306(2), MCA, when it cooperated in giving Debra a loan pay-off figure.  Nonetheless, the District Court held that American's perfected lien along with the underlying debt was discharged pursuant to § 30-3-310(1), MCA, when American took the Valley Bank cashier's check.  The court agreed with Madison's argument that American had no obligation to return the Valley Bank cashier's check and that, in doing so, American waived its absolute right to insist that Valley Bank honor the check and to payment.

¶14  Subject to exceptions not applicable here, the parties do not dispute that, as between a holder of a perfected security interest in collateral (here, American) and a purchaser of that collateral (Madison), the security interest follows the collateral and any identifiable proceeds therefrom notwithstanding sale, exchange or other disposition, unless the disposition was authorized by the secured party in the security agreement or otherwise.  Section 30-9-306(2), MCA.  Therefore, unless American lost its lien, its security interest takes priority notwithstanding Madison's purchase of the collateral.  It is this question of which party has superior rights in the collateral that we first address.

### I.

¶15  Which party--American or Madison--has superior rights in the collateral?

¶16  Commercial paper is a vital component of the economy of this and other nations and is the means by which commerce is transacted.  Accordingly, rules governing the issuance, utilization, honoring and dishonoring of commercial paper have developed over time and have been uniformly accepted and applied.  Our present rules find their origins in the Law Merchant of England.  Previously codified as the Uniform Sales Act and Uniform Negotiable Instruments Law, Montana, like other states, has now enacted these and other commercial laws through its adoption of the Uniform Commercial Code (UCC).  The transactions here at issue are governed by these laws and in particular by the laws pertaining to negotiable instruments codified in Title 30, Chapter 3 of the Montana Code Annotated.

¶17  "Checks" are negotiable instruments and encompass drafts, cashier's checks and teller's checks.  Section 30-3-104(1) and (6), MCA.  A cashier's check is a draft with respect to which the drawer and drawee are the same bank or branches of the same bank.  Section 30-3-104(7), MCA.  Acceptance of a draft is the drawee's signed agreement to honor the draft as presented. Section 30-3-410(1), MCA.

¶18  Citing Kaufman v. Chase Manhattan Bank, N.A. (S.D.N.Y. 1973), 370 F. Supp. 276, 279, and other authorities, Madison argues that a cashier's check is the equivalent of cash because the issuing bank stands behind the check and pledges its resources to the payment of the amount of the check on presentation.  According to Madison, a bank may not dishonor such an instrument, for to do so would be inconsistent with the issuing bank's representations and would undermine public confidence in the bank and its checks and thus deprive the cashier's check of its essential utility as a "cash equivalent".  Accordingly, Madison contends that Valley Bank's cashier's check was good as against all the world and was impervious to dishonor. Thus, Madison contends that American had the right and obligation to hold the cashier's check, to refuse Valley Bank's request to return the instrument, to insist that the check be paid according to its terms, and to apply the proceeds of the check in discharge of David's loan and lien.  According to Madison and the trial court, the fact that American "gratuitously" returned the check to Valley Bank, did not obviate American's obligation to discharge  David's loan and to release its lien on the collateral.

¶19  Given Madison's arguments and the trial court's reasoning along these lines, it is appropriate that we begin our analysis by expressing our disagreement with Madison's  basic premise--that an issuing bank may not dishonor its cashier's check.  While it is true that cashier's checks may be considered as "cash equivalents" in the minds of the public and in commercial trade, and while various courts and commentators have taken the view, typically on public policy grounds, that an issuing bank may not assert its own defenses against or dishonor its cashier's check, this rule is neither as universal nor as absolute as Madison suggests.  (See, for example, Stringfellow v. First American Nat. Bank (Tenn. 1994), 878 S.W.2d 940.  Although the appellate court ultimately sides with Madison's approach, the appellate court discusses the differing lines of authority and the arguments for each.)

¶20   Importantly, "nothing in the U.C.C. suggests that cashier's checks should be treated differently from other instruments subject to Articles 3 and 4 [Title 30, chapters 3 and 4, MCA]."  Farmers & Merchants State Bank v. Western Bank (9th Cir. 1987), 841 F.2d 1433, 1440.  See also Equitable Trust Co. v. G & M Const. Corp. (D. Md. 1982), 544 F. Supp. 736, 746; Santos v. First Nat'l State Bank of N.J. (N.J. Super.Ct.App.Div. 1982), 451 A.2d 401, 406.

¶21   Thus, and despite the "cash equivalent" approach, other courts have acknowledged that in limited circumstances an issuing bank may dishonor its cashier's check.  See, for example, the following and the cases cited therein: Farmers & Merchants State Bank, 841 F.2d at 1438-41; Godat v. Mercantile Bank of Northwest Cty. (Mo.Ct.App. E.D. 1994), 884 S.W. 2d 1, 3-4; Rezapolvi v. First Nat. Bank of Maryland (Md. 1983), 459 A.2d 183, 188-89. Appropriate to our later discussion in this opinion, the Maryland Court of Appeals in Rezapolvi stated:

>        Despite the language in some opinions suggesting that a
>     bank may never dishonor its cashier's check, courts have
>     recognized that a bank may do so under very limited conditions.
>     These are where the holder has dealt with the bank in
>     connection with the transaction or is not a holder in due course,
>     and where the cashier's check was obtained by fraud upon the
>     bank or under certain circumstances, where there was no
>     consideration given to the bank for the instrument.

Rezapolvi, 459 A.2d at 188-89.

¶22   Accordingly, contrary to Madison's basic argument, depending upon the status of the funds used to purchase the Valley Bank cashier's check and American's status--i.e., whether it was or was not a holder in due course under the UCC as regards this transaction--American was not in the unassailable position that Madison argues it was.  Indeed, the fact that the aborted loan pay-off at issue here was initiated by the delivery of a cashier's check does not, in and of itself, dispose of this case.  Rather, it is necessary that we look to other provisions of Montana's UCC as those are applicable to the case sub judice.

¶23   Underlying the District Court's decision and Madison's arguments is the premise that American initially took the Valley Bank cashier's check for value, in good faith and without notice of any defect or defense with the result that the subsequent notice of the stolen nature of the funds used to purchase the instrument did not defeat American's ability to negotiate the Valley Bank cashier's check free of defenses.  The trial court and Madison reason that American's return of the check instead of presenting it for payment was a gratuitous act.  Thus, the debt was still deemed discharged and the lien released.

¶24   For this approach to be legally supportable, however,  it must first be established that American was a holder in due course--a concept not addressed in the trial court's decision.  That is, if American enjoyed holder-in-due-course status before it returned the check to Valley Bank, then Madison and the trial court are correct.  American could have presented the check to Valley Bank for payment free of defenses and it should have insisted that Valley Bank pay

the check.  Section 30-3-305, MCA.

¶25  If American was not a holder in due course, then   30-3-306, MCA,
comes into play. This section provides:
    A person taking an instrument, other than a person having rights
    of a holder in due course, is subject to a claim of a property or
    possessory right in the instrument or its proceeds, including a
    claim to rescind a negotiation and to recover the instrument or
    its proceeds.  A person having rights of a holder in due course
    takes free of the claim to the instrument.

Thus, since David stole the funds he used to purchase the Valley Bank
cashier's check delivered to American, American's claim to the check was
subject to Debra's ownership interest in the funds stolen to purchase it.
Furthermore, American's claim to the check was subject to Valley Bank's
ability to refuse payment and assert Debra's ownership interest as a defense,
subject only to joining Debra in the lawsuit to also personally assert her claim
of theft.  Section 30-3-305(3), MCA.  See also Official Comment No. 4 to
1991 Amendment of § 30-3-305, MCA.  Accordingly, whether American was
a holder in due course of the Valley Bank cashier's check is critical.

¶26  Under § 30-3-302(1), MCA, a holder in due course is one who holds
an instrument  if:
        (a) the instrument when issued or negotiated to the holder
    does not bear such apparent evidence of forgery or alteration or
    is not otherwise so irregular or incomplete as to call into
    question its authenticity; and
        (b) the holder took the instrument:
        (i) for value;
        (ii) in good faith;
        (iii) without notice that it is overdue or has been
    dishonored or that there is an uncured default with respect to
    payment of another instrument issued as part of the same series;
        (iv) without notice that the instrument contains an
    unauthorized signature or has been altered;
        (v) without notice of any claim to the instrument stated in
30-3-306; and
        (vi) without notice that any party to the instrument has
    any defense or claim in recoupment stated in 30-3-305(1).

The elements of this statute being in the conjunctive, all must be present; the
failure to meet any one of the requirements defeats the holder-in-due-course
status.  Farmers & Merchants State Bank, 841 F.2d at 1443; Godat, 884
S.W.2d at 5.

¶27  In short, unless American could have demonstrated that it had already
taken the instrument in good faith and for value at the time it was notified that
the funds used to purchase the Valley Bank check were stolen, then it was not
a holder in due course and, as pointed out above, American's claim to the
check would have been subject to Debra's property interest in the check (§ 30-3-306,
MCA)
and to Valley Bank's ability to dishonor the instrument (§ 30-3-305(3),

MCA, and Rezapolvi, 459 A.2d at 188-89).  It follows, then, that we must determine whether, on the facts here, American satisfied the statutory requirements for obtaining holder-in-due-course status.  We conclude that it did not.

¶28  While American initially received the Valley Bank check in good faith and without notice of the underlying theft, once American was advised of the theft it could not go forward  in "good faith" and "without notice" of Debra's adverse claim and Valley Bank's defenses.   "Good faith" means "honesty in fact  and the observance of reasonable commercial standards of fair dealing." Section 30-3-102(1)(d), MCA.

> Although fair dealing is a broad term that must be defined in
> context, it is clear that it is concerned with the fairness of
> conduct rather than the care with which an act is performed.

Uniform Commercial Code § 3-103 cmt. 4, 2 U.L.A. 24 (1990).  We would be hard-pressed to conclude that honesty in fact and fairness of conduct would allow a financial institution to negotiate an instrument once having been notified that the instrument was stolen or was purchased with stolen funds.

29   As to notice, "[n]otice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction. . . . " Section 30-1-201(27), MCA.  "To be effective, notice must be received at such time and in such manner as to give a reasonable opportunity to act on it." Section 30-3-302(6), MCA. There is no dispute that American was notified of the theft of funds used to purchase the Valley Bank check prior to the note marked "PAID" and the lien release leaving American's business premises.  At the time it received notice, American still had time and was fully capable of reversing the administrative steps it had taken to process the loan pay-off.  Thus, the notice of the theft given American by Valley Bank was an effective notice that American could not simply ignore.

¶30  Given the timing of the delivery of the Valley Bank cashier's check to American followed by American's processing of the loan pay-off and the subsequent notice of the stolen nature of the funds, the crucial inquiry then becomes: Had American taken the instrument "for value" by the time notice was received?  If American took the cashier's check for value prior to Valley Bank's notice, then all of the § 30-3-302(1), MCA, elements would have been satisfied and American would have enjoyed the status of a holder in due course.  To the contrary, if, at the time of Valley Bank's notification, American had not yet given value for the check--if American had not yet irrevocably changed its position--then the statutory elements would not have been satisfied (and could not thereafter be satisfied) and American would not be a holder in due course.

¶31  "Value" is defined in § 30-3-303, MCA. This statute, in pertinent part, provides:

> (1) An instrument is issued or transferred for value if:
> (a) the instrument is issued or transferred for a promise

of performance, to the extent that the promise has been
performed;
    (b) the transferee acquires a security interest or other lien
in the instrument other than a lien obtained by judicial
proceedings;
    (c) the instrument is issued or transferred as payment of,
or as security for, an existing obligation of any person, whether
or not the obligation is due;
    (d) the instrument is issued or transferred in exchange for
a negotiable instrument; or
    (e) the instrument is issued or transferred in exchange for
the incurring of an irrevocable obligation to a third party by the
person taking the instrument.

¶32  American argues that the applicable provision of this statute is
subsection (1)(a); Madison  contends that subsection (1)(c) controls.  We
conclude that it is unnecessary that we decide which subsection is appropriate,
for under either American did not give value or irrevocably change its position
before receiving Valley Bank's notice.

¶33  As noted by the court in Godat:
    "One can only take 'for value' by giving in return something 'of
    value' to the one from whom the instrument is taken."  "Good
    faith" is in large part a subjective test but "for value" is
    objective.  Plaintiff's position essentially eliminates the objective
    "for value" requirement by substituting therefore a subjective
    belief that value is being given.  The premise of the "holder in
    due course" doctrine is to protect those persons who part with
    something of value in reliance on the negotiability of a check or
    other instrument.  Persons who give up nothing of value do not
    need the protection of the doctrine because they put nothing at
    risk and give up nothing.

Godat, 884 S.W.2d at 6 (citing Blue Cross Health Services v. Sauer
(Mo.Ct.App. 1990), 800 S.W.2d 72).

¶ 34  That was American's situation here.  When it first received the Valley
Bank cashier's check, American had no notice or knowledge of the stolen
nature of the funds.  Neither had it parted with value,  however.  American's
stamping the note "PAID," its executing the lien release, and its placing these
documents in the outgoing mail basket, were merely internal administrative
actions which, up until the point in time that the documents were placed into
the possession of the post office for delivery, did not irrevocably commit
American to the pay-off.  To that point, American was just as capable of
administratively reversing the steps it had taken to process  the loan pay-off as
it was in performing those steps in the first place. The note had not actually
been returned "paid" nor had American's lien actually been released.
American had not irrevocably changed its position.  At the point it received
notice from Valley Bank, nothing which American had accomplished in
processing the loan pay-off had any effect on American's secured position.
Objectively, at that point, American had  given up nothing; it had put nothing

at risk. American had not given value--even assuming that it subjectively believed that value was being given when it commenced the loan pay-off process. Godat, 884 S.W.2d at 6.

¶35 Putting this within the framework of § 30-3-303(1)(a), MCA, American effectively agreed that it would discharge the note and release the lien on David's equipment in exchange for payment of his debt. American was in the process of performing its end of this bargain when it was notified by Valley Bank of the underlying stolen nature of the funds which had been transferred to American. If (1)(a) is the applicable subsection, after notification American would be a holder in due course only to the extent that it had actually performed, i.e., to the extent that it had actually discharged the note and released the collateral lien. See Hawkland & Lawrence UCC Series § 3-303:02 (1994).

> The holder is, in essence, required to mitigate the damages of the party having the defense. Discovering a defense to the instrument he bargained for will usually permit the holder to suspend the remainder of his counter-performance. Not being required to perform, the holder is not given holder in due course status and is, thus, not permitted to increase the obligor's loss by rendering an excused performance. The holder is not usually harmed by his suspension of performance. Since a negotiable instrument is simply a promise to pay money, the holder will not be deprived, as in the case of a contract to purchase goods, of some needed commodity.

Hawkland & Lawrence UCC Series § 3-303:02 (1994). Since American was fully capable of administratively undoing the loan pay-off and retaining its secured position, it was required to suspend performance. Had it proceeded in the face of Valley Bank's notice, American could not have claimed holder-in-due-course status.

¶36 Similarly, in the context of § 30-3-303(1)(c), MCA, the result is the same on these facts. While the Valley Bank check was issued to American in payment of David's antecedent obligation, American had not given value because it had not actually released its security interest in the collateral; it had not irrevocably committed itself to the transaction; it had not put its secured position at risk. Again, while it had taken certain internal administrative steps toward discharging the note and releasing the lien, those could all be administratively rescinded and, in fact, were rescinded. Having not irrevocably released its security interest, American had not taken the Valley Bank cashier's check for value by the time it received notice. See Hawkland & Lawrence UCC Series § 3-303:06 (1994).

¶37 In short, under either § 30-3-303(1)(a) or (1)(c), MCA, American did not give value and was, therefore, not a holder in due course. It took the cashier's check subject to Debra's possessory and property interest and subject to Valley Bank's defenses.

¶38 As regards the trial court's reliance on § 30-3-310(1), MCA, we conclude that the court erred by not first determining whether American was a holder in due course of the cashier's check. Section 30-3-310(1), MCA, provides, in pertinent part:

> Unless otherwise agreed, if a . . . cashier's check . . . is taken for
> an obligation, the obligation is discharged to the same extent
> discharge would result if an amount of money equal to the
> amount of the instrument were taken in payment of the
> obligation.

Madison maintains that, under this law of "absolute payment," the payee/obligee (here, American) who takes a cashier's check no longer has recourse against the remitter/obligor (David) because the obligation is discharged with the result that the payee/obligee (American) has recourse only on the instrument against the issuing bank (here, Valley Bank).

¶39  As a general proposition, we do not disagree.  If, in fact, American "took" the Valley Bank cashier's check for David's obligation, then, clearly, under § 30-3-310(1), MCA, David's obligation is discharged and Madison must prevail as against American.  This, however, begs the question: Did American "take" the Valley Bank cashier's check under the facts of this case?  For the reasons set forth above, we determine that it did not.

¶40  Moreover, both parties and the trial court rely on Transamerica Insurance Company v. Long (W.D. Pa. 1970), 318 F.Supp. 156, in support of their respective positions.  We do not find this case at odds with our decision here.  While the court ruled that cashier's checks are like money and that title passes with delivery, the court also made it clear that if the recipient takes stolen funds with knowledge of the theft--with mala fides, in the words of the court--then the holder's title will be defeated.  Transamerica, 318 F.Supp. at 160.  Again, in the case at bar, before American "took" the cashier's check it had received notice of the stolen nature of the funds used to purchase the Valley Bank cashier's check. Under such circumstances its title would be defective.

¶41  Finally, our discussion would not be complete without also observing that this case seemingly proves the adage that "no good deed goes unpunished."  In spite of doing what most would agree was honest, responsible, fair and morally correct, American's reward for "doing the right thing" was the loss of its security interest and any real ability to obtain payment for the loan it made to David.  American was determined to be the "stuckee" despite its being the least blameworthy of all of the participants in this unfortunate case.

¶42  Of  the players, Madison was in the best position to protect itself.  It had constructive and actual knowledge of American's security interest. Yet, it delivered two checks payable to David and Debra without taking any of the commercially reasonable steps to protect its purchase that are common in these sorts of transactions.  Madison could have insisted on the lien release before payment; it could have withheld part of the payment pending the lien release; it could have confirmed the pay-off amount and paid part of the proceeds directly to American; it could have made payment jointly to American to the extent of its security interest; it could have gone with David to American and witnessed the pay-off and obtained a release; or it could have escrowed the payment until the lien release was obtained.  Madison did none of these things.

Instead, it merely relied on David's bald assurance that American's lien would be released.

¶43 Likewise, Valley Bank could have verified that Debra's endorsement on the Bozeman bank's check used to purchase the $20,000 cashier's check was valid. It did not. Then, of course, there are the real culprits, David and Debra, whose scam left Madison, American and Valley Bank all holding the bag.

¶44 In a shoot-out using the weapons of the UCC, there is no guarantee that the survivor will be the party wearing the white hat. Fortunately however, on the facts of this case, the proper application of the code produces not only the correct legal result, but also the one most justifiable from a good public policy, common sense and basic fairness point of view.

¶45 We hold that the District Court's decision on summary judgment awarding superior rights in the collateral to Madison was in error and must be reversed.

II.

¶46 Did American waive its rights under its written security agreement by acquiescing to David's sale of the collateral in a manner inconsistent with the terms of the security agreement.

¶47 By way of cross appeal, Madison argues that the District Court erred in not ruling that American waived its rights under its written security agreement and, thus, extinguished its lien by "authorizing" David's sale of the collateral. Specifically, on July 5, 1994, Debra called American to advise that the loan would be paid off and to obtain the pay-off figure. Jo Ann testified that she answered "good, I'll tell Della," when Debra stated that they (presumably David and Debra) were selling off the loader and expected to pay off the loan by Thursday, July 7th. Madison contends that in her July 5, 1994 conversation with Debra, Jo Ann, with knowledge of the troubled history of the loan, with knowledge of American's security interest, and with knowledge that the security agreement forbade sale of the collateral without written consent, nonetheless acquiesced in the disposal of the collateral without contemporaneously imposing commercially reasonable restrictions on the sale. Moreover, Madison maintains that a secured party authorizes its debtors' sale of the collateral when it accepts the proceeds from the sale.

¶48 The District Court concluded that American did not in any way consent to the sale and to the extinguishment of its security interest as contemplated by § 30-9-306(2), MCA, by merely cooperating in giving Debra a pay-off figure. We agree with the trial court on this issue.

¶49 Section 30-9-306(2), MCA, provides:
> Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds

including collections received by the debtor.

> [T]he theory of subsection 9-306(2) and the other cutoff provisions in the [UCC] is that, if the secured party authorizes the sale, he or she should not legitimately be able to continue to look to the collateral as security. Further, a buyer under such circumstances is justified in believing that the collateral will not be looked to. However, when both the secured party and the buyer of the collateral expect the secured party to continue to look to the collateral as security, neither of those justifications exist. In 1990, the Permanent Editorial Board approved PEB Commentary No. 3 and supplemented the second paragraph of official Comment 3 to Section 9-306; both the Commentary and the supplemented Comment confirm the Editorial Board's position that a transferee will not acquire the collateral free and clear of the security interest if the secured party authorizes the disposition subject to his or her security interest.

Hawkland, Lord & Lewis UCC Series § 9-306:2 (1997).

¶50 In the case at bar, we cannot conclude that despite whatever knowledge of the history of David's loan she had at the time, Jo Ann's comment "good, I'll tell Della," in the context in which it was made, could have been construed by anyone as American's authorization or acquiescence that the loader could be sold free of American's perfected security interest. In fact, the evidence is overwhelmingly to the contrary. The record gives every indication that Debra, David, Madison and American all understood that David's loan would be paid from the proceeds of the sale of the equipment to Madison and that the disposition of the collateral was subject to American's security interest. There is no factual basis in the record here to conclude otherwise.

¶51 Madison also argues that American waived its rights under the security agreement. It is well established, however, that waiver is the voluntary, intentional relinquishment of a known right and will be declared only when the waiving party clearly manifests such an intention. McGregor v. Mommer (1986), 220 Mont. 98, 110, 714 P.2d 536, 543 (citations omitted). The presence of voluntariness and requisite intent are necessarily questions of fact. McGregor, 220 Mont at 110, 714 P.2d at 544. Again, there is no evidence in the record on appeal that American waived its rights under the security agreement. Indeed, the evidence is to the contrary. The trial court's finding that American did not consent to or authorize the sale of the collateral free of its security interest is supported by substantial evidence and must be upheld.

¶52 Finally, we find no merit to Madison's argument that American accepted the proceeds from the sale of the collateral and, thus, discharged David's obligation. As pointed out above, American did not accept the Valley Bank cashier's check, but, in fact, returned it to Valley Bank. American has never received any of the proceeds of the sale of the collateral.

¶53 We reject Madison's arguments on its cross appeal and affirm on this issue.

III.

¶54   The judgment against Valley Bank.

¶55   The District Court also rendered summary judgment in favor of Valley Bank and against American on American's claim of indemnity. While American also appealed from this summary judgment, given our decision as to Issues I and II, this appeal is moot and is properly dismissed with prejudice.

                              Conclusion

¶56   In summary, we hold that American retained its perfected security interest in the collateral and that its rights are superior to those of Madison. Accordingly,  we reverse the District Court's contrary decision and remand for further proceedings, including the assessment of attorney fees pursuant to § 30-9-511, MCA, and costs against Madison, and for entry of a judgment consistent with this opinion.  The appeal against Valley Bank is dismissed with prejudice.

                      /S/   JAMES C. NELSON


We Concur:

/S/   J. A.  TURNAGE
/S/   JIM REGNIER
/S/   KARLA M. GRAY
/S/   WILLIAM E. HUNT, SR.
/S/   W. WILLIAM LEAPHART